NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

10th Circuit Court-Derry Family Division
No. 2017-0375


IN RE E.G.


Argued: February 14, 2018
Opinion Issued: August 17, 2018


Gordon J. MacDonald, attorney general (Sean R. Locke, assistant attorney general, on the memorandum of law and orally), for the State.


Christopher M. Johnson, chief appellate defender, of Concord, on the brief, and Eric S. Wolpin orally, for the juvenile.


LYNN, C.J. The juvenile, E.G., appeals the Circuit Court's (Leonard, J.) finding of delinquency, contending that the court erred in denying his motion to suppress statements given by him to the arresting officer without Miranda warnings. See Miranda v. Arizona, 384 U.S. 436 (1966). We affirm.

The trial court found or the record reflects the following facts. On February 10, 2017, the Londonderry police and fire departments were dispatched to the D. family residence on a report of an incapacitated juvenile. When Lieutenant Dion of the fire department arrived, he found a teenaged boy, D.D., conscious, but severely intoxicated and vomiting. D.D. was being helped by another juvenile, later identified as his brother, R.D. "[O]ut of medical concern for polysubstance abuse," Dion quickly scanned the room and, inside a Budweiser box, saw a plastic sandwich bag containing a green leafy substance he believed to be marijuana.

Shortly after Dion's arrival, Officer Garcia of the police department reached the scene. Outside the D. residence, Garcia observed E.G. and his brother, R.G., in the driveway near a vehicle. Garcia entered the residence and went upstairs to D.D.'s bedroom. Officer Mottram of the police department arrived at the D. residence a minute later.

Upon entering D.D.'s bedroom, Garcia immediately smelled burnt marijuana. Dion told Garcia that he had seen a bag of marijuana in a Budweiser box. Garcia immediately looked in the box, but the bag was no longer there. "[B]elieving that the juveniles outside could have removed the marijuana and that a crime had occurred," Garcia radioed to Mottram and "instructed [him] to make sure that the two juveniles outside, [E.G.] and R.G., were not allowed to leave the scene."

After D.D. was taken from the home by ambulance, Garcia asked "Mottram to tell [E.G.] and R.G. to come into the residence." E.G's and R.G.'s mother, who was also at the D. residence, gave Garcia permission to speak with them. Garcia, along with E.G., R.G., their mother (Mrs. G.), and R.D., returned to D.D.'s bedroom. The three juveniles sat on one of the beds in the room while Garcia and Mrs. G. stood next to the bed. The juveniles were neither under arrest nor put in handcuffs, nor was Garcia "blocking the doorway or otherwise obstructing their ability to leave."

The court noted that there had been "conflicting testimony about whether Mrs. G[.] remained in the bedroom for the duration of" the juveniles' questioning. Garcia testified that Mrs. G. was in the room the entire time. Mrs. G., however, testified that Garcia "asked her to step out of the room at some point during his questioning." Mrs. G. further testified that she wanted to stay in the room, but it was not clear to the court whether Mrs. G. conveyed that preference to Garcia.

Garcia asked the juveniles "to tell him what had happened" and they responded that D.D. had rapidly drunk half a bottle of vodka. Garcia asked the juveniles about the marijuana smell and all three denied using marijuana. Garcia then told them that Dion, a "neutral person," had seen a bag of marijuana which was no longer there. E.G. then admitted to removing the marijuana and throwing it under his mother's vehicle. Garcia radioed outside to Mottram, who found the marijuana under Mrs. G.'s car. Garcia testified that after E.G's admission, and on the advice of a third officer who had arrived on the scene, he placed E.G. under arrest.

E.G. was petitioned as a delinquent for having committed the offenses of falsifying physical evidence, see RSA 641:6 (2016), and possession of drugs, see RSA 318-B:2 (2017). The delinquency petitions indicate that, at the time of the alleged offenses, E.G. was sixteen years old. The petitions also alleged that E.G.'s case had been screened and deemed inappropriate for diversion because

2

E.G. was "being petitioned as a delinquent for a felony level charge, and has several previous police contacts where he was involved in disturbances, criminal mischief and reckless conduct."

E.G. filed a motion to suppress, among other things, "all evidence obtained in violation of [his] right against self-incrimination." Specifically, he contended that he had been subjected to custodial interrogation by Garcia without having been informed of his rights in accordance with Miranda and State v. Benoit, 126 N.H. 6 (1985). The trial court denied the motion. An adjudicatory hearing was held, at which the State introduced Garcia's testimony that E.G. "admitted that he had taken the marijuana out of the box and brought it outside and threw it under the vehicle." After the State's presentation of evidence, the court dismissed the petition alleging falsification of physical evidence, but found E.G. delinquent on the drug possession charge.

On appeal, E.G. contends that the trial court erroneously denied his motion to suppress because it wrongly determined that he was not in custody when questioned by Garcia. He challenges the introduction of his statements to Garcia under both Part I, Article 15 of the New Hampshire Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. We first address the defendant's claim under the State Constitution and rely upon federal law only to aid in our analysis. State v. Ball, 124 N.H. 226, 231-33 (1983).

"Before the [juvenile's] responses made during a custodial interrogation may be used as evidence against him, the State must prove, beyond a reasonable doubt, that it did not violate his constitutional rights under Miranda." State v. McKenna, 166 N.H. 671, 676 (2014) (quotation and brackets omitted). As the foregoing implies, two conditions must be met, as a general rule, "before Miranda and Benoit warnings are required: (1) the suspect must be 'in custody'; and (2) [he] must be subject to 'interrogation.'" In re B.C., 167 N.H. 338, 342 (2015). In this appeal, the only issue before us is whether the trial court erred in finding that E.G. was not in custody. As the State notes, the trial court made no finding as to whether Garcia's questioning of E.G. constituted interrogation and that issue is not raised on appeal.

We first address, however, a preliminary argument by the State that Miranda warnings were not required because the interaction at issue was merely an investigatory stop. The State contends that Garcia's detention of E.G. was warranted because, once Garcia smelled burnt marijuana and learned that the bag observed by Dion was missing, he had reasonable suspicion that one of the juveniles had engaged in criminal activity. See State v. Joyce, 159 N.H. 440, 444 (2009) (noting two-step inquiry for determining whether police conducted lawful investigatory stop: (1) when was the defendant seized; and (2) "at that time, [did] the officers possess[] a reasonable suspicion that the defendant was, had been or was about to be engaged in criminal

3

activity" (quotation and brackets omitted)).  The State further asserts that the scope of Garcia's questioning was "limited . . . to confirming or dispelling the suspicion he had developed."  See State v. Turmel, 150 N.H. 377, 383 (2003) (noting that "[d]uring a legal investigatory stop, an officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions").  Thus, the State argues, Garcia's questioning "amounted to nothing more than a Terry stop, to which Miranda does not apply."  See Terry v. Ohio, 392 U.S. 1 (1968).

We recognized, in State v. Turmel, that although the subject of an investigatory, or Terry, stop is "'seized' in a Fourth Amendment sense[,] . . . [s]uch temporary custody does not . . . constitute custody for Miranda purposes and, therefore, Miranda warnings are not triggered."  Turmel, 150 N.H. at 383.  As explained by the First Circuit Court of Appeals, "[a]s a general rule, Terry stops do not implicate the requirements of Miranda, because[,] . . . though inherently somewhat coercive, [they] do not usually involve the type of police dominated or compelling atmosphere which necessitates Miranda warnings."  United States v. Streifel, 781 F.2d 953, 958 (1st Cir. 1986) (quotation omitted).

Nevertheless, even assuming, without deciding, that Garcia had reasonable suspicion to conduct an investigatory stop, the subject of an investigatory stop "must be advised of his Miranda rights if and when he is 'subjected to restraints comparable to those of a formal arrest.'"  Id. (quoting Berkemer v. McCarty, 468 U.S. 420, 441 (1984)).  Thus, even granting the initial validity of Garcia's detention of E.G., we must still determine "whether an otherwise valid Terry stop escalated into a de facto arrest necessitating the administration of Miranda warnings."  United States v. Trueber, 238 F.3d 79, 93 (1st Cir. 2001).

> There is no scientifically precise formula that enables courts to distinguish between investigatory stops and "de facto arrests[.]"  The ultimate inquiry, however, is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.  In assessing whether there was [such] a restraint on freedom of movement, a court must examine all the circumstances surrounding the interrogation.  This is an objective test: the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation.

Id. (quotations, citations, and ellipses omitted); cf. Turmel, 150 N.H. at 385 (noting, in determining that defendant was not in custody during investigatory stop, that "defendant could [have] reasonably conclude[d] that he was not free to leave, but not that he was under the functional equivalent of arrest").

The "ultimate inquiry" identified in Trueber, 238 F.3d at 793, therefore, is the same test we use to determine whether any interaction with police is custodial under Part I, Article 15, as that test also begins with the recognition that "[c]ustody entitling a [person] to Miranda protections requires formal arrest or restraint on freedom of movement of the degree associated with formal arrest." McKenna, 166 N.H. at 676 (quotation omitted). Accordingly, we now turn to the determination of whether E.G. was "in custody," for purposes of Part I, Article 15, under that test.

Here, in a finding not challenged on appeal, the trial court determined that E.G. was not under arrest. "In the absence of formal arrest, we must determine whether [E.G.'s] freedom of movement was sufficiently curtailed by considering how a reasonable person in [E.G.'s] position would have understood the situation." Id. at 676-77 (quotation omitted). But see Turmel, 150 N.H. at 383 (observing that "[t]he police may temporarily detain a suspect for investigatory purposes," and "[s]uch temporary custody does not, however, constitute custody for Miranda purposes"). "To determine whether a reasonable person in [a suspect's] position would believe himself in custody, the trial court should consider the totality of the circumstances of the encounter." McKenna, 166 N.H. at 677 (quotation omitted). Factors to be considered include, but are not limited to: "the number of officers present, the degree to which the suspect was physically restrained, the interview's duration and character, and the suspect's familiarity with his surroundings." Id. (quotation omitted).

Our standard of review on appeal recognizes that the custody determination "is a law-dominated mixed question in which 'the crucial question entails an evaluation made after determination of the historical facts: if encountered by a "reasonable person," would the identified circumstances add up to custody as defined in Miranda?'" State v. Ford, 144 N.H. 57, 62-63 (1999) (quoting Thompson v. Keohane, 516 U.S. 99, 113 (1995)) (brackets omitted). "The trier of fact is not 'in an appreciably better position' than we to answer that question." Id. at 63 (quoting Thompson, 516 U.S. at 114-15). Accordingly, although we will not overturn the trial court's findings of historical fact "unless they are contrary to the manifest weight of the evidence, we review the ultimate determination of custody de novo." Id.

In determining that E.G. was not in custody, the trial court reasoned: [E.G.] was questioned in the familiar and comfortable location of his friend's bedroom. He was questioned by one police officer in the presence of his two friends and his mother, at least part of the time, and with her permission. He was therefore not subjected to "incommunicado" questioning in a "police-dominated atmosphere" unlike the situation in Miranda. [E.G.] was not restrained, in any manner, and was free to leave the room, if he so chose.

5

E.G. challenges the trial court's conclusion, arguing that the following factors support the conclusion that he was in custody: (1) "the police created a police-dominated atmosphere by controlling [his] movements"; (2) "the interrogation was accusatory"; (3) he was at no point told that he was free to leave or to terminate the interrogation; (4) he was a juvenile; and (5) "the police initiated contact with [him], rather than he with them." The State, on the other hand, argues that the trial court's determination that E.G. was not in custody is supported by the following factors: his "familiarity with his surroundings, the presence of one officer, the presence of other non-law enforcement individuals, the lack of physical restraint, the brief nature of the interview, the lack of aggressive questioning, E.G.'s prior experience with law enforcement, and the authorization and presence of E.G.'s mother."

We first address E.G.'s argument that his "status as a juvenile must influence the determination of the custody issue," as it has relevance to our consideration of other factors. See In re D.L.H., Jr., 32 N.E.3d 1075, 1088 (Ill. 2015) (noting that "[w]here, as here, the person questioned is a juvenile, the reasonable person standard is modified to take that fact into account"). With respect to his federal constitutional challenge, E.G. is certainly correct. In J.D.B. v. North Carolina, 564 U.S. 261 (2011), the United States Supreme Court held that "so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the [Miranda] custody analysis is consistent with the objective nature of that test." J.D.B., 564 U.S. at 277. Indeed, the State concedes, citing J.D.B., that "[f]or juveniles, age may also be a factor."

With respect to the State Constitution, we have not explicitly held that juvenile status is a factor in the Miranda custody analysis. In In re B.C., we noted, citing J.D.B. for support, a distinction between adults and juveniles subject to police questioning. In re B.C., 167 N.H. at 346. We observed, in distinguishing a case cited by the State, that "while the arrestee in [the cited case] was an adult, [B.C.] was fourteen years old at the time of her arrest, and, therefore, was more likely to feel coercive pressure as a result of her arrest." Id. We had no need, however, to determine whether a reasonable person in B.C.'s position would believe herself in custody — and therefore no reason to determine whether B.C.'s juvenile status would be a factor in that determination — because B.C. was actually under formal arrest at the time of interrogation. Id. at 342-43.

Nevertheless, "[t]his State long has recognized the common-sense fact that a child does not possess the discretion and experience of an adult and that special procedures are required to protect juveniles, who possess immature judgment." Benoit, 126 N.H. at 11 (citation omitted). Moreover, we noted in Benoit that "[s]cholars, courts and legislators have recognized that a child's immaturity and inexperience place him or her at a greater disadvantage than an adult in dealing with the police." Id. at 15. Accordingly, in that case,

"[w]e adopted a comprehensive, fifteen-factor test for trial courts to use in evaluating a juvenile's purported waiver" of the fundamental rights guaranteed under Part I, Article 15 of the New Hampshire Constitution. State v. Farrell, 145 N.H. 733, 737 (2001); see also Benoit, 126 N.H. at 15, 18-19.

From Benoit's recognition that juveniles are at a "greater disadvantage" than adults in police encounters, Benoit, 126 N.H. at 15, it takes no great leap of logic to conclude, as did the United States Supreme Court, that "a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go." J.D.B., 564 U.S. at 272. Accordingly, we now hold that a juvenile's age at the time of questioning is an appropriate factor to consider in the custody analysis under Part I, Article 15 of the New Hampshire Constitution. Because the State does not claim that Garcia was unaware of E.G.'s status as a juvenile, we have no occasion to address in this case the effect, if any, of an officer's lack of knowledge of such status on the custody analysis.

E.G. further contends that "the police created a police-dominated atmosphere by controlling [his] movements, both in first ordering him not to leave the scene, and later in ordering him into the house to speak with Garcia." The trial court found that, when Mottram arrived on the scene, Garcia instructed him to not allow E.G. and R.G. to leave the scene and, thereafter, Mottram told the boys to go into the D. residence. However, the trial court made no finding as to whether Garcia's instruction to Mottram to detain E.G. and R.G. was ever communicated to the juveniles. In fact, the only testimony on the issue was Garcia's affirmative response to the prosecutor's suggestion that Mottram "presumably" told the juveniles to remain on the premises. Because the State bore the burden of proof at the suppression hearing and failed to offer evidence as to what, if anything, Mottram said to E.G. and R.G. in response to Garcia's instructions, we assume for purposes of our analysis that Mottram did tell them not to leave, and that this had the effect of causing E.G. and R.G. to be "seized."

The fact that Mottram summoned E.G. to come inside the residence and go upstairs to D.D.'s bedroom in order to speak with Garcia is also a factor that we consider in our analysis. However, we disagree with E.G. that these actions "contributed to the creation of a police-dominated atmosphere."

In McKenna, we cited with approval the analysis in United States v. Mittel-Carey, 493 F.3d 36 (1st Cir. 2007), in which the First Circuit Court of Appeals "concluded that the level of control that the officers exercised over the defendant during the interrogation conducted at the defendant's home carried the most weight in its custody analysis." McKenna, 166 N.H. at 678. We further noted that the Mittel-Carey court "explained that this factor weighed heavily in favor of custody, despite the defendant's familiarity with the

surroundings." Id. However, the level of control that the officers exercised in Mittel-Carey is readily distinguishable from the present case.

In Mittel-Carey, during an encounter with officers that lasted one and one-half to two hours, the defendant was "ordered to dress, go downstairs, and was told where to sit; he was physically separated from his girlfriend and not allowed to speak to her alone; and he was escorted by agents on the three occasions that he was permitted to move, including while he used the bathroom." Mittel-Carey, 493 F.3d at 40. Those facts demonstrate significantly more control than here, where Mottram told E.G. and R.G. to return to the bedroom of their friend's house but did not escort them, and E.G. and R.G. were joined in the bedroom by their mother and their friend. Accordingly, although the fact that Garcia exercised control over E.G. does weigh in favor of a finding of custody, it does not weigh heavily due to the limited nature of that control.

E.G. next argues that a finding that he was in custody is further supported by the accusatory nature of Garcia's questions and statements. The State contends that Garcia's questioning was not accusatory. "The accusatory nature of questioning is widely recognized as a factor weighing in favor of a finding of police custody." McKenna, 166 N.H. at 681. "Consistent with this widely accepted approach, we have repeatedly recognized the importance of the absence or presence of accusatory questioning in our analysis of custody, contrasting accusatory questioning, which weighs in favor of custody, with questioning of a purely general nature, which supports a determination of no custody." Id. at 682. Thus, "[i]n our analysis, we consider the presence or absence of both accusatory questions and accusatory statements made during questioning." Id. at 681.

The trial court found the following facts regarding Garcia's questioning of E.G., R.G., and R.D.

> Officer Garcia asked the boys to tell him what had happened and the juveniles told him D.D. had . . . quickly consumed a ½ bottle of vodka. Officer Garcia asked [them] about the smell of marijuana and all three boys denied using marijuana. Officer Garcia told them that Lieutenant Dion who was a neutral person, [saw] a bag of marijuana in the bedroom, but the marijuana was now missing. [Garcia] asked again where the marijuana was. [E.G.] then admitted to removing the marijuana from the room and throwing it under his mother's vehicle.

We consider the character of this exchange to be similar to the questioning that can lawfully occur during an investigatory stop. "During a legal investigatory stop, an officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming

8

or dispelling the officer's suspicions." Turmel, 150 N.H. at 383; see also McCarty, 468 U.S. at 439 ("Under the Fourth Amendment . . . a policeman who lacks probable cause but whose observations lead him reasonably to suspect that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to investigate the circumstances that provoke suspicion." (quotations omitted)). "The scope of the stop, however, must be carefully tailored to its underlying justification—to confirm or to dispel the officer's particular suspicion." Turmel, 150 N.H. at 383. "The stop must last no longer than is necessary to effectuate its purpose." Id.

That is what happened here. Garcia had a suspicion that one or more of the boys had committed the crime of drug possession based upon the smell of burnt marijuana and Dion's observations. Garcia detained and briefly questioned the boys regarding his suspicions, his observations, and the observations of Dion. This is consistent with the scope and purpose of a valid investigatory stop, which does not require Miranda warnings.

The circumstances of Garcia's questioning are fundamentally different from cases in which we have found that the accusatory nature of questions weighed in favor of a finding of custody. In State v. Jennings, 155 N.H. 768 (2007), the police investigated an allegation that the defendant had committed a sexual assault. Jennings, 155 N.H. at 769. The next day, police officers drove to the defendant's residence, convinced the defendant to return with them to the police station, and questioned him in an interview room in the police station. Id. at 769-71. Similarly, in McKenna, the police received a report that the defendant had committed a sexual assault. McKenna, 166 N.H. at 674. Police officers investigated the report, obtained an arrest warrant, drove to the defendant's restaurant, and then questioned him for more than an hour. Id. at 674-75.

Neither of these cases involved a situation, such as here, where a police officer in the field developed a reasonable suspicion that a crime had occurred and investigated that potential crime scene by briefly asking the people present about their knowledge of, or involvement in, the suspected criminal activity. For example, if an officer pulls over a vehicle for a traffic violation and thereafter develops a reasonable suspicion that the driver is intoxicated, i.e., a suspicion that another crime may have occurred, as part of the lawful investigatory stop, the officer is permitted to ask the driver about his use of alcohol in an attempt to confirm or dispel the officer's suspicion without providing Miranda warnings. See McCarty, 468 U.S. at 437-39 (reasoning that traffic stops do not exert sufficient pressure upon a detained person that Miranda warnings are necessary in all cases). The same is true here. See Podlaski v. Butterworth, 677 F.2d 8, 9 (1st Cir. 1982) (reasoning that Miranda warnings are not required prior to "general on-the-scene questioning as to facts surrounding a crime"; nor are they required "simply because the questioned person is one whom the police suspect" (quotations, brackets, and ellipsis

9

omitted)).  Garcia arrived at the scene to help the fire department, as needed.  He smelled burnt marijuana and, although he did not personally observe it, he was told that there had been a bag containing a leafy green substance.  He briefly detained the people who had been present at the potential crime scene and questioned them about drug possession.  See id. (determining that defendant was not in custody because he was not told he was under arrest, he was in a home familiar to him, and "police activity was consistent with investigatory questioning").  In this context, questioning of this type, even if directed at suspected criminal activity, does not weigh heavily in favor of a finding of custody.

E.G. next notes that there is no evidence he was ever informed that he was not under arrest or that he was free to terminate questioning.

> [T]he extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will often defines the custodial setting.  Conversely, the lack of a police advisement that the suspect is at liberty to decline to answer questions or free to leave is a significant indication of a custodial detention.

United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993) (citations omitted); see also McKenna, 166 N.H. at 679-80 (citing Griffin for same proposition).  We have considered such evidence even where the suspect was admittedly not free to leave because he was seized, in a Fourth Amendment sense, in a Terry stop.  See Turmel, 150 N.H. at 385 (noting that officer told defendant during Terry stop that he was not under arrest).

Although Garcia did not put the juveniles in handcuffs or tell them that they were under arrest, E.G. is correct that Garcia also did not tell them that they were not under arrest or that they did not have to answer his questions.  Accordingly, this factor weighs slightly in favor of a finding of custody.

E.G. further points out that he was not allowed to leave even at the conclusion of police questioning.  See, e.g., Howes v. Fields, 565 U.S. 499, 509 (2012) (noting, as factor relevant to Miranda custody determination, "the release of the interviewee at the end of the questioning").  Under the circumstances of this case, we disagree that this fact weighs in favor of a finding of custody.  The fact that a defendant is allowed to leave at the conclusion of police questioning may be evidence that the defendant was not in custody because it "indicates to a court that police did not have sufficient information to take the suspect into custody before the interrogation, since even after the interrogation the arrest was not made, and, as probably no grounds existed to take the suspect into custody, custody would have been illegal."  3 William E. Ringel, Searches & Seizures, Arrests and Confessions

10

§ 27:9, at 27-35 to 27-36 (2d ed. 2012). However, when a defendant makes inculpatory statements that support his subsequent arrest, we cannot retrospectively determine from the fact of the defendant's arrest whether the defendant was in custody prior to those statements. Here, E.G. was arrested after his inculpatory statements and Mottram's subsequent recovery of the marijuana. Because Garcia was aware of these facts when he made the decision to arrest E.G., we have no way of knowing from the fact of E.G.'s arrest whether Garcia would have taken E.G. into custody had E.G. not made those statements. Accordingly, the fact that E.G. was arrested at the conclusion of Garcia's questioning does not factor into our analysis of whether E.G. was in custody at the time he made the statements in question.

The final factor E.G. argues in support of a finding that he was in custody is that "the police initiated contact with [him], rather than he with them." See McKenna, 166 N.H. at 684 ("Also relevant to our assessment of the character of the interrogation is the fact that the police initiated the contact with the defendant."). Here, although the record shows that Garcia summoned E.G. back into the residence for questioning, the suppression hearing testimony did not clearly identify, and the trial court made no finding regarding, who called the authorities for emergency assistance for D.D., a fact that could be relevant to our custody determination. See State v. MacDonald, 402 P.3d 91, 100 (Utah Ct. App. 2017) (finding defendant not in custody for Miranda purposes where, inter alia, he "initiated contact with authorities by having his roommate call 911 when he found [the allegedly abused child] unresponsive"); see also Self v. Milyard, No. 11-cv-00502-REB, 2012 WL 365998, at *19 (D. Colo. Feb. 2, 2012) (dismissing habeas corpus challenge to state court decision finding applicant not in custody for Miranda purposes at crime scene when, inter alia, he "initiated contact with authorities by calling 911, to which a reasonable person would expect both paramedics and police would respond" (quotation omitted)). Thus, although we cannot say that, as an initiator of the contact, E.G. should have understood that the police likely would ask him questions, the record does make it clear that this case does not involve a police-initiated contact — that is, it is clear that someone called the police to the scene. Accordingly, we conclude that this factor does not weigh in favor of a finding of custody.

Turning to the State's arguments, the State contends that E.G's familiarity with his surroundings weighs against a finding of custody. "[A] defendant's familiarity with his surroundings, taken in isolation, often weighs against a finding of custody." McKenna, 166 N.H. at 685; see also United States v. Parker, 262 F.3d 415, 419 (4th Cir. 2001) (determining that defendant was not in custody, in part, because she was questioned by officers in a bedroom in her home and a relative entered the room on two occasions during the questioning); Podlaski, 677 F.2d at 9 (determining that defendant was not in custody, in part, because he was questioned on the back cellar steps of his own house, which was a familiar location). We note, however, that "the

11

location of questioning is not, by itself, determinative: a defendant may be in custody in his own home but not in custody at a police station." McKenna, 166 N.H. at 685 (quotation and brackets omitted).

Here, E.G. was questioned in his friend's bedroom. While E.G. was likely less familiar with this location than he would have been at his own house, it was still a familiar location, and certainly a less custodial setting than a police station. See id. at 693 (Lynn, J., dissenting); United States v. Hughes, 640 F.3d 428, 435-36 (1st Cir. 2011). On balance, this factor weighs against a finding of custody.

The State also cites, as a factor weighing against a finding of custody, that E.G. was not questioned for an extended period of time. Although the trial court made no finding as to the length of either E.G.'s detention or questioning, the record evidence concerning the limited number of questions asked suggests that the questioning was not protracted. While, in general, this factor weighs against a finding of custody, the length of questioning can be a relatively "undeterminative factor in the analysis of custody." Griffin, 922 F.2d at 1348; see also State v. Goupil, 154 N.H. 208, 226 (2006) (finding no custody when interview lasted less than fifteen minutes); State v. Johnson, 140 N.H. 576, 578 (1995) (finding no custody, in part, when questioning lasted approximately ten minutes). "While Miranda was most obviously concerned with the 'marathon' routine of questioning a suspect, custody has been found in relatively brief interrogations where the questioning is of a sort where the detainee is aware that questioning will continue until he provides his interrogators the answers they seek." Griffin, 922 F.2d at 1348 (quotation omitted). On balance, we conclude that here the brevity of the encounter weighs against a finding of custody.

The State also contends that "E.G. was not overwhelmed by the presence of multiple officers" and "the presence of other non-law enforcement individuals" supported a finding that E.G. was not in custody. The State additionally notes that E.G. was questioned with "the authorization and presence of [his] mother."

The number of officers present is a relevant factor in a custody determination — when multiple officers isolate and question a defendant, it is more likely that the defendant is in custody. See Jennings, 155 N.H. at 773 (reasoning that "[t]he fact that three officers and a prosecutor went to meet the defendant certainly bolsters the trial court's custody determination). Conversely, the presence of friends or family has been considered a factor weighing against a finding of custody. See In re D.L.H., Jr., 32 N.E.3d at 1088. The factor apparently originates from Miranda's characterization of a "custodial interrogation as one where a suspect may be deprived of the moral support of family and friends, contrasting it with his home where 'his family and other friends are nearby, their presence lending moral support.'" Cummings v. State,

341 A.2d 294, 298 (Md. Ct. Spec. App. 1975) (quoting <u>Miranda</u>, 384 U.S. at 450).

Here, E.G. was questioned by only one officer, Garcia. Although another officer, Mottram, was present at the D. residence, he only told E.G. and R.G. not to leave and then to go upstairs — he did not escort them into the house, and he was not in the bedroom when Garcia questioned the boys. During Garcia's questioning, E.G.'s brother and friend were present the entire time, and his mother was present at least part of the time. This is not a situation, like <u>Jennings</u>, where multiple officers isolated and questioned a defendant. <u>See</u> <u>Jennings</u>, 155 N.H. at 773. Only one officer questioned E.G., and E.G. was not deprived of the moral support of family and friends. Accordingly, these circumstances weigh in favor of a finding that E.G. was not in custody.

Having considered the parties' arguments, we now review the ultimate determination of custody <u>de</u> <u>novo</u>. <u>Ford</u>, 144 N.H. at 63. Considering the totality of the circumstances of the encounter, we conclude that a reasonable juvenile in E.G.'s position would not have believed himself to be in custody, and therefore, that E.G. was not in custody for <u>Miranda</u> purposes when he made the incriminating statements to Garcia. <u>See</u> <u>McKenna</u>, 166 N.H. at 677.

The police told E.G., a juvenile, to go to the familiar location of his friend's bedroom, where a single officer briefly questioned him in the presence of his friend, brother, and, for at least part of the time, his mother. Although Garcia did not tell E.G. that he was free to terminate the questioning, neither did Garcia restrain E.G. or tell him that he was under arrest. This type of brief, on-scene detention and investigatory questioning does not amount to custody. Accordingly, based upon the totality of the circumstances, we conclude that the State established, beyond a reasonable doubt, that it did not violate E.G.'s <u>Miranda</u> rights, under the State Constitution, on the asserted ground that E.G. was in custody.

The Federal Constitution offers the defendant no greater protection than does the State Constitution with regard to the defendant's rights under <u>Miranda</u>. <u>See</u> <u>Turmel</u>, 150 N.H. at 385; <u>Terry</u>, 392 U.S. at 20-29. Therefore, we reach the same result under the Federal Constitution.

<u>Affirmed</u>.

HICKS, BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.

13