NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Hillsborough-southern judicial district
No. 2017-0599

THE STATE OF NEW HAMPSHIRE

v.

ABHISHEK SACHDEV

Argued: September 27, 2018
Opinion Issued: November 28, 2018

Gordon J. MacDonald, attorney general (Stephen D. Fuller, senior assistant attorney general, on the brief and orally), for the State.

Shaheen & Gordon, P.A., of Concord (James D. Rosenberg on the brief and orally), for the defendant.

DONOVAN, J. Following a jury trial in Superior Court (Temple, J.), the defendant, Abhishek Sachdev, was convicted on two counts of aggravated felonious sexual assault, see RSA 632-A:2, I(f), (m) (Supp. 2017), and one count of simple assault, see RSA 631:2-a, I(a) (2016). On appeal, the defendant argues that the trial court erred when it denied his motion to suppress upon finding that: (1) he was not in custody for Miranda purposes when he was questioned by detectives about the alleged assault, see Miranda v. Arizona, 384 U.S. 436 (1966); and (2) his consent to search the store and his person were "voluntary and free of duress and coercion." We affirm.

The following facts are drawn from the trial court's order. In July 2016, K.L. reported to Detective Lombardi of the Nashua Police Department that someone she described "as a thin, darker skin man named 'Abi'" had sexually assaulted her inside of a new wireless store in Nashua. On July 13, at approximately 4:45 p.m., Lombardi and his colleague, Detective DiTullio, went to the store. They wore plain clothes with their badges around their necks and their guns displayed on their hips. Even though the store was not yet open to the public, the detectives were able to enter through the main entrance. The detectives informed the defendant and another man, Diego Gomez, that they were investigating a female's complaint about the prior night, and asked if they would be willing to give statements at the police station "voluntarily." The defendant and Gomez agreed. The conversation "was cordial, polite, and short, lasting five minutes."

All four men then left the store and Gomez locked the doors. Lombardi suggested that the defendant and Gomez take separate vehicles in case one of them finished his interview early. A patrol officer then arrived to secure both entrances to ensure that no one entered the store in their absence. The defendant and Gomez drove to the police station in their own vehicles and the detectives drove in an unmarked cruiser. The four men entered the station through the front lobby. Both Gomez and the defendant were signed in as visitors at 5:15 p.m. The detectives did not take any items from the defendant, such as his keys or cell phone.

After signing in the two men, the detectives brought them to a waiting area in the detectives' bureau located on the second floor. The detectives decided to first interview Gomez and asked the defendant to remain in the waiting room. The defendant agreed. The detectives told the defendant to let them know if he needed anything during the wait. The defendant was alone and unsupervised and was not restrained in any manner while in the waiting area. The door to the exit remained unlocked and the defendant could have left at any time without the assistance of the detectives or any other officer.

The detectives interviewed Gomez for approximately twenty-five minutes, after which Lombardi met the defendant in the waiting room and brought him to a small interview room. The room contained a table and three chairs. Lombardi gave the defendant a "victim/witness background sheet" and asked him to complete it. Lombardi then left the room.

Thereafter, both DiTullio and Lombardi entered the room, and they began interviewing the defendant at 5:52 p.m. The interview was audio and video recorded. At the beginning of the interview, Lombardi told the defendant the following:

No one forced you to come in here, right?  You're not under arrest right now. . . .  [T]hat door is shut just for our privacy.  It's not locked.  If at any time you don't want to talk to us, you just let us know and we will bring you back outside and you can get in your car and leave.

Before the questioning began, the defendant received a call on his cell phone.  The defendant answered the phone and had a brief conversation with the caller.  After the call, the defendant completed the "victim/witness background sheet."  The detectives then began to question the defendant about the night of July 12.  The trial court found that the tone of the interview was conversational, the detectives did not raise their voices, and the defendant gave long narrative responses rather than "yes" or "no" answers.

During the interview, the defendant acknowledged that he met K.L. at the wireless store the previous night.  He stated that after he saw her walking barefoot near the store, he asked her if she wanted help.  She agreed to go into the store.  The defendant, K.L., and Gomez then drank together in the store.  The defendant indicated that he left the store to buy more beer and a package of condoms, in case something might "happen."  The defendant represented that when he returned, the three of them continued to drink and, at some point, K.L. vomited and fell asleep.

The defendant denied that anything sexual happened with K.L.  He stated that he left the store when his wife called him around 12:30, and when he did, K.L. was outside on the sidewalk with Gomez.  The defendant also reported that K.L. tried kissing him but he did not reciprocate because she was vomiting and was too impaired.

Approximately thirteen minutes into the interview, the following exchange occurred, as recited in the trial court's order:[1]

Lombardi:  And what happened after she was kissing you?
Defendant:  Nothing.
Lombardi:  That was it?  You're positive?
Defendant:  Yes.
Lombardi:  Well, what if I told you that I had some evidence to suggest otherwise?  Would you say that that was inaccurate evidence?  Like I said, I just want the truth from you.  Okay?
Defendant:  I am telling the truth.

---

[1] Although the defendant provided us with a transcript of the interview, we rely upon the trial court's order for the substance of the interview because the trial court's recitation of the interview is based upon its review of the video recording of the interview, rather than the transcript of the interview, which was produced after the suppression hearing.

Lombardi:   She's an adult.  She's not a kid or anything like that, okay?  You know, it is what it is.  I just want you to be truthful with me.

Defendant:  I have a wife.  You have to understand that.

Lombardi:   We're not going to talk to your wife.  This is a private conversation just between us, okay?  No one outside of this room is going to hear this.  I just want you to be truthful with me.  If . . . what happens between you and your wife, that's your own thing.

Defendant:  Can I consult a lawyer by any chance?

Lombardi:   If you want to talk to a lawyer, . . . that's fine.  Okay, I'm just trying to talk to you man to man.  Um, let me lay out what we have right here, okay.  Basically, um, your store — we're going to need to take some pictures of the inside of it.  We're gonna need to look through it for some beer cans and some things like that.  [Gomez] told us that she was bleeding in there and that he had like cleaned her up with some [inaudible].  We want to be able to get those things.  So there is a couple of ways for us to go about doing that.  Okay.  We can get a search warrant or we can get consent from you.  It's entirely . . .

Defendant:  You can go ahead.  You can do that.

DiTullio:    Let me go get the consent form.

[Detective DiTullio leaves the room]

Lombardi:   All right, so what we are going to do is review a consent to search form.  As I said, we are going to go in there, we're going to take pictures, we're going to get those items that we need to get, and then you can have your store back.  Okay.  Um.  All right.  So.

[Detective DiTullio returns with form]

Defendant:  I mean what happened to her?  Is she in trouble?

Lombardi:   She's not in trouble.  Like you said, she had some cuts and scrapes on her.  We were trying to figure out where those came from.  That kind of stuff.

Defendant:  [inaudible] [W]e feel bad because she was walking barefoot.  That's why we took her in.  I'll be helping you.  You can go in and take a look.  Whatever you want.  So but tomorrow can we do the sales over there or no?

4

Lombardi:     Assuming that we can just go in there and take pictures . . . As soon as we are done [inaudible as they talk over each other]

. . .

Lombardi:     All right.  This is basically our standard consent to search form.  Okay, so we have everyone fill this out when we are searching something.  So I'll read it and then you can read it with me as I am reading it to you. . . . So "I . . . have been informed of my constitutional right not to have a search made of my . . . premise."
Defendant:    <u>Not</u> to have?
Lombardi:     Yes.  So you have the right to not let us do this, and have us get a search warrant, which means we'll close down your business until . . .
Defendant:    No, you can go ahead . . .
Lombardi:     So you have the right to not let us take these pictures and not search your building.  Okay?  You have that right. . . .  Hold on one second, let me start again here . . .  So I, your name, have been informed of my constitutional right not to have a search made of my premise um without a search warrant and of my right to refuse to consent to . . . such a search . . . do hereby authorize the below listed individuals, who have identified themselves to me as law enforcement officers, to conduct a complete search of my premise situated at your business 83 Main Street.  They are also authorized to remove any letters, papers, materials or other property which they may desire.  I understand that anything discovered may be used against me in a criminal proceeding.  This consent to search has been given by me voluntarily without threats or promises of any kind.  Okay, so I'm not threatening you, I'm not telling you that I'm going to do anything that I'm not going to do. . . .  Do you have any questions about it first of all?
Defendant:    Nope.
Lombardi:     If you agree to that, you can sign right there and then date and time.

[Defendant signs form]

Lombardi:     All right.  And then.  You said nothing sexual happened with you and her, right?  Nothing like that.
Defendant:    [inaudible]

5

Lombardi:    I was going to fill out another one of these and ask for buccal swabs, which is basically I'll take a little Q-tip and rub the inside of your mouth to get a DNA sample. Are you okay with consenting to that?

DiTullio:    It's two Q-tips, they're about this long. We'll rub one on the inside of your cheek and one on the other side of the cheek. And that's it. . . .

Lombardi:    Like I said, it's to get a . . . some of your DNA.

Defendant:    Why's that?

Lombardi:    You said that there was no sexual assault . . .

Defendant:    [inaudible] consulting a lawyer?

Lombardi:    Well that's fine if you want to consult a lawyer about that. Like I said I'm not going to force you to do that. I'm not going to make you any promises, but the buccal swabs are to take DNA so we can compare them against any other DNA that may or may not have been found. It's entirely up to you. Same thing with this one, I'm not going to force you to do anything you don't want to.

Defendant:    I mean, you can go ahead on that one [referring to the search of the store].

Lombardi:    Okay, but you don't want to sign the consent for the swabs for your DNA?

Defendant:    Not right now.

Lombardi:    Not right now?

Defendant:    No.

Lombardi:    Okay. All right. Fair enough. All right, so with that being said, we'll run out there. We'll take photographs, we'll go look through there get that all done and um that way you can have your business back up and running and do what you have to do, okay?

The recording ends shortly thereafter at 6:11 p.m. Both detectives then left the room to review the information they had gathered and the defendant remained inside the interview room. The detectives decided that they would apply for a search warrant to obtain buccal swabs, penile swabs, pubic hairs, fingernail clippings, and some of the defendant's clothing.

After approximately five minutes, Lombardi went back into the interview room to inform the defendant about the next steps in the investigation. Lombardi explained that they were going to apply for a search warrant to obtain the buccal swabs and other bodily samples. Lombardi explained the search warrant process and again asked the defendant for his consent to obtain these samples. During this brief discussion, the defendant reconsidered his decision and agreed to consent to the search of his person. This interaction

6

was not recorded. However, the trial court found that Lombardi credibly testified that he did not make any threats or promises to the defendant.

The defendant then executed a "consent to search" form similar to the form by which he consented to a search of the store. Lombardi read it aloud and asked the defendant if he had any questions. After explaining what was being requested of the defendant — "buccal swabs, clothing, undergarments, swabs of fingers, penile swabs [and] pubic combing" — the defendant initialed the form next to the list of items and signed the bottom of the form at 6:30 p.m. He did not have any questions during the process.

Lombardi obtained the buccal swabs from the defendant at the station and then the detectives brought him to the hospital to collect the additional samples. Afterwards, the detectives brought the defendant back to the station. The detectives did not ask the defendant any questions during the drive to and from the hospital. At the station, Lombardi thanked the defendant for his cooperation and gave the defendant his business card. The defendant then got into his vehicle and left the station. The detectives obtained an arrest warrant one week later and subsequently arrested the defendant on July 22, 2016.

Prior to trial, the defendant moved to suppress "any and all evidence" obtained after he allegedly "invoked his right to counsel," or, in the alternative, to suppress evidence obtained during the warrantless searches of the store and his person because his consent to both of those searches was not free, knowing, and voluntary. Following an evidentiary hearing, the trial court concluded "that the defendant was not in custody at any point during the interview and therefore was not entitled to Miranda protections." Also, the court found that, because the defendant signed the two consent forms, was not in custody, and was not threatened or coerced in any way, the "State has shown by a preponderance of the evidence that his consent to search the store and his person was voluntary and free of duress and coercion." The jury thereafter convicted the defendant. This appeal followed.

On appeal, the defendant argues that the trial court erred when it found that: (1) he was not in custody for Miranda purposes when he was questioned by the detectives about the alleged assault; and (2) his consent to the searches of the store and his person was free and voluntary. The defendant cites both the State and Federal Constitutions in support of his arguments that the trial court erred when it denied his motion to suppress. See N.H. CONST. pt. I, arts. 15, 19; U.S. CONST. amends. IV-VI, XIV. We first address the defendant's claims under the State Constitution and rely upon federal law only to aid in our analysis. State v. Ball, 124 N.H. 226, 231-33 (1983).

We begin by addressing the defendant's argument that the trial court erred in finding that he was not in custody for Miranda purposes. Before a defendant's responses made during a custodial interrogation may be used as

7

evidence against him, the State must prove, beyond a reasonable doubt, that it did not violate his constitutional rights under Miranda. State v. McKenna, 166 N.H. 671, 676 (2014). For Miranda warnings to be required a defendant must be subjected to custodial interrogation by the police. See State v. Hammond, 144 N.H. 401, 403 (1999). Therefore, as a general rule, two conditions must be met before Miranda warnings are required: (1) the suspect must be "in custody"; and (2) he must be subject to "interrogation." In re B.C., 167 N.H. 338, 342 (2015). In this appeal, the only issue is whether the trial court erred in finding that the defendant was not in custody.

"Custody entitling a defendant to Miranda protections requires formal arrest or restraint on freedom of movement of the degree associated with formal arrest." McKenna, 166 N.H. at 676 (quotation omitted). "In the absence of formal arrest, we must determine whether a suspect's freedom of movement was sufficiently curtailed by considering how a reasonable person in the suspect's position would have understood the situation." Id. at 676-77 (quotation omitted). To determine whether a reasonable person in the defendant's position would believe himself in custody, the trial court should consider the totality of the circumstances of the encounter. Id. at 677. "Factors to be considered include, but are not limited to: the number of officers present, the degree to which the suspect was physically restrained, the interview's duration and character, and the suspect's familiarity with his surroundings." In re E.G., 171 N.H. ___, ___ (decided August 17, 2018) (slip op. at 5) (quotation omitted).

On appeal, we recognize that the custody determination "is a law-dominated mixed question in which 'the crucial question entails an evaluation made after [the] determination of [the historical facts]: if encountered by a "reasonable person," would the identified circumstances add up to custody as defined in Miranda?'" State v. Ford, 144 N.H. 57, 62-63 (1999) (quoting Thompson v. Keohane, 516 U.S. 99, 113 (1995)). "The trier of fact is not 'in an appreciably better position' than we to answer that question." Id. at 63 (quoting Thompson, 516 U.S. at 114-15). Accordingly, although we will not overturn the trial court's findings of historical facts unless they are contrary to the manifest weight of the evidence, we review the ultimate determination of custody de novo. Id.; In re E.G., 171 N.H. at ___ (slip op. at 5).

Here, the trial court's findings of historical facts relating to custody are not in dispute. Accordingly, we accept and rely upon the historical facts as set forth in the trial court's suppression order. Moreover, we note that the appellate record does not contain the videotape of the defendant's interview with the detectives, which the trial court had the benefit of considering before issuing its order. See Bean v. Red Oak Prop. Mgmt., 151 N.H. 248, 250 (2004) (burden on appealing party to provide court with record sufficient to decide issues on appeal); see also Sup. Ct. R. 13(3) (we will not ordinarily review any part of the record that has not been provided to us in an appendix by a party or

transmitted to us by the trial court or administrative agency). Therefore, we must assume that the evidence in the record was sufficient to support the trial court's factual findings as they pertain to the interview, i.e., the detectives' tone, demeanor, and physical presence. See Bean, 151 N.H. at 250.

In its order, the trial court found the following factors weighed against a finding of custody: (1) the defendant agreed to go to the police station voluntarily and drove there himself; (2) the defendant entered through the front lobby of the station and signed in as a visitor; (3) only two detectives were present throughout the evening; (4) the detectives were in plain clothes; (5) although armed, the detectives did not brandish their weapons; (6) "[m]ost importantly, at the start of the interview, the defendant was notified that his presence was voluntary and . . . he was not under arrest," and "that he could stop the interview at any time and . . . the defendant would be permitted to leave"; (7) the detectives "presented a relaxed demeanor and were cordial toward [the] defendant"; and (8) the interview was short, lasting less than twenty minutes. While the trial court acknowledged that there are some facts suggesting that the defendant was in custody — the interview room was small and the defendant sat in the chair furthest from the door, the detectives initiated contact with the defendant at his place of business, and the questioning took place at the police station — when considering the "totality of the circumstances of the encounter," State v. Jennings, 155 N.H. 768, 772 (2007) (quotation omitted), the court found that the defendant was not in custody at any point during the interview.

The defendant argues that the trial court overlooked the following facts in its custody analysis: (1) the detectives did not honor their promise to end the interview even though the defendant twice asked to consult with counsel; (2) the entire interaction between the officers and the defendant lasted over two and a half hours; (3) the detectives' questions were accusatory; (4) two detectives initiated contact with the defendant at his place of business, invited him to the police station, and left a uniformed officer to guard the defendant's place of business; and (5) the two officers had badges around their necks and guns at their side. We address the defendant's argument as to each fact in turn.

First, the defendant argues that when the trial court credited Lombardi for informing the defendant that he could terminate the questioning and leave at any time, the trial court failed to consider the fact that the detectives did not honor this promise when the defendant twice asked for the assistance of counsel during the interview. Essentially, the defendant asserts that when he asked to consult with an attorney this question served as a request to end the interview. The defendant contends, therefore, that we should not give as much weight to the "demonstrably superficial warning" the detectives gave to the defendant here as we have in prior cases. We disagree.

9

We have previously held that whether a suspect is informed that he or she is free to terminate the interrogation at any time is a significant factor in our custody analysis. See McKenna, 166 N.H. at 680; State v. Locke, 149 N.H. 1, 7 (2002) ("Given the repeated advice that he was free to leave, we conclude that a reasonable person in the defendant's position would not believe he was restrained to the degree associated with formal arrest."); State v. Johnson, 140 N.H. 573, 578 (1995) (finding no custody, based, in part, upon fact that trooper informed defendant he was free to leave). We have also noted that a statement to a suspect that he is not under arrest generally weighs against a finding of custody. See McKenna, 166 N.H. at 679; Hammond, 144 N.H. at 404 (finding no custody, based, in part, upon fact that officers informed the defendant several times that he was not under arrest and that he was free to leave at any time).

As an initial matter, whether the detectives intended to honor their promise to end the interview at the time they offered it is not the focus of this inquiry. We need not examine the subjective intent of the detectives; rather, we conduct an objective analysis to determine whether a reasonable person would have believed that he was restrained to the degree associated with formal arrest. See McKenna, 166 N.H. at 676-77. Thus, to the extent that the defendant asserts that the detectives never intended to permit him to terminate the interview, this claim is irrelevant to our analysis.

Objectively, given the facts here, the detectives' responses to the defendant's request for an attorney have no bearing on the weight we give to the detectives' representations that the defendant was free to leave or terminate the interview because the defendant did not request to do so. His request to consult with an attorney cannot be equated to a request to terminate the interview. We find support for this conclusion in our decision in Locke, where we recognized that repeatedly advising a defendant that he is free to leave is a strong indication that the defendant is not in custody. Locke, 149 N.H. at 7. We concluded that the defendant in Locke was not in custody despite his inquiry to the detective during the interview if he had any rights. Id. at 5. Nor did the interview become custodial in Locke when the defendant stood up, walked out of the interview room, and "ran into" the detective in the hallway and then returned to the interview room, because the detective neither blocked the defendant's path nor told the defendant to go back into the room. Id. at 5, 7.

Similarly, here, at no time did the defendant ask to leave the interview room or to terminate the interview. Nor is there evidence in the record to suggest that the defendant made gestures or otherwise indicated that he wanted to leave or terminate the interview. Indeed, the defendant asking to consult with an attorney is more akin to the defendant in Locke asking if he had any rights. The detectives here did not, as the defendant contends, ignore their promise that the defendant could terminate the interview at any time.

10

There is no indication in the record that the detectives restricted the defendant's ability to leave or end the questioning. Thus, we find that this factor — instructing the defendant that he is free to leave at any time — weighs against a finding of custody even when considering the defendant's request to consult with a lawyer.

Second, the defendant argues that the trial court erred in finding that the length of the interview was a factor that weighed against a finding of custody. The defendant contends that the trial court failed to consider the entire interaction between the defendant and the officers when calculating the length of the interview. Specifically, the defendant asserts that the detectives spent over two and a half hours with him — from the moment the officers arrived at the defendant's business to when the detectives returned the defendant to the police station after going to the hospital. We recently noted that "[w]hile in general, [brief interrogations] weigh[] against a finding of custody, the length of questioning can be a relatively 'undeterminative factor in the analysis of custody.'" In re E.G., 171 N.H. at ___ (slip op. at 12) (quoting United States v. Griffin, 922 F.2d 1343, 1348 (8th Cir. 1990)). We recognize that the defendant's interaction with the detectives lasted over two hours, but the record supports the trial court's finding that the only substantive questioning occurred while the defendant was in the interview room at the station, which lasted less than twenty minutes. Cf. Locke, 149 N.H. at 6-7 (finding no custody, and recognizing, in part, that the interview's duration was not excessive — it lasted for three and one-half hours, and there was no evidence of shouting or harsh tones). On balance, we conclude that despite the length of the overall interaction, the trial court did not err by only considering the brevity of the interview at the station and we agree with the trial court that this factor weighs against a finding of custody.

Third, the defendant argues that the accusatory nature of the questioning weighs in favor of a finding of custody. "[W]e have repeatedly recognized the importance of the absence or presence of accusatory questioning in our analysis of custody, contrasting accusatory questioning, which weighs in favor of custody, with questioning of a purely general nature, which supports a determination of no custody." McKenna, 166 N.H. at 682; Jennings, 155 N.H. at 775 (nature of interrogation is important factor in custody determination); see also State v. Dedrick, 132 N.H. 218, 225 (1989) (finding custody, in part, because intensity of the interview escalated when the officers accused the defendant of untruths and stated "time and again" that it was the defendant who had killed the victim), abrogated on other grounds by State v. Ford, 144 N.H. 57, 62-63 (1999); cf. State v. Graca, 142 N.H. 670, 675 (1998) (concluding that the defendant was not in custody, in part, because the "questioning throughout the incident was of a purely general nature"). The defendant relies upon Jennings to argue that when Lombardi urged the defendant to be truthful and "confronted him with alleged evidence which was inconsistent with his denial of sexual contact with K.L.," this accusation weighs

11

in favor of finding custody.  See Jennings, 155 N.H. at 774.  In Jennings, however, the officer began the interview by immediately "confront[ing] the defendant with his daughter's allegations of sexual assault and said he was certain she was telling the truth."  Id.  Moreover, in Jennings, we considered the questioning during the interview in conjunction with the "control exercised by the police from the beginning of the encounter," which clearly indicated "that the police believed the defendant to be guilty of sexual assault [signaling] to a reasonable person that his freedom of movement was curtailed to the degree associated with formal arrest."  Id.

By contrast, in this case, Lombardi stated only that he had some evidence to suggest that the defendant's statements were inaccurate and that he just wanted the truth from the defendant.  Lombardi then provided the defendant with an opportunity to respond.  Furthermore, there is nothing in the record to suggest that Lombardi accused the defendant of committing a specific crime.  Cf. McKenna, 166 N.H. at 682-83 (concluding that the accusatory nature of the questioning — repeatedly asking the defendant, for over an hour, why he sexually assaulted the victim — weighed in favor of a finding of custody).  The majority of the questioning was not accusatory in nature and as soon as it became arguably accusatory, the defendant asked to consult with an attorney.  At that point, the questioning ceased, but for one assertion made in the context of a request for consent to search, asking the defendant to confirm his denial that any sexual assault had occurred.  Furthermore, here, unlike the confrontational tone used in Jennings, the trial court found that "the detectives presented a relaxed demeanor[,] . . . were cordial toward the defendant," and did not "raise their voices."  Thus, the overall tone of the interview was not accusatory and, therefore, this factor weighs against a finding of custody.

Fourth, the defendant argues that when the trial court considered the fact that the detectives were in plain clothes as a factor that weighs against custody, the trial court ignored the "actual appearance of the detectives involved."  We generally find the fact that the officers are in plain clothing to weigh against a finding of custody.  See Locke, 149 N.H. at 4, 6 (finding no custody when, in part, the two officers were in plain clothes, displayed their badges when identifying themselves, and weapons were not displayed).  However, we recognize that in this case, this factor weighs slightly more in favor of a finding of custody because the two detectives' weapons and badges were plainly visible to the defendant, and a third uniformed officer arrived to guard the store while the defendant and Gomez went to the police station.  These facts differ from situations where the officers are in plain clothes and their weapons are not visible.  Thus, taken together, these facts weigh slightly in favor of a finding of custody.

Finally, the defendant argues that in conducting its custody analysis, the trial court "missed" the dynamic of the situation involving the detectives'

12

initiation of contact. We acknowledge that when police initiate contact with the suspect, custody is more likely to exist. See McKenna, 166 N.H. at 684 (relevant to our assessment of the character of the interrogation is the fact that the police initiated the contact with the defendant). Contrary to the defendant's assertion, however, the trial court considered this factor as weighing in favor of finding custody and we do not disagree. As the trial court also noted, all of the factors are to be considered together to determine whether there was "restraint on freedom of movement to the degree associated with formal arrest." Id. at 676 (quotation omitted). We do not rely on any single factor in isolation. Id. at 686.

In reviewing the ultimate determination of custody, we acknowledge that some facts weigh in favor of finding custody, including: the appearance of the detectives; the detectives' initiation of contact with the defendant; and the questioning at the police station in a small interview room, with the door closed, and with the defendant in the chair furthest from the door. However, in addition to the facts discussed above that weigh against a finding of custody, the following facts also suggest that the defendant was not in custody: the defendant agreed to go to the police station; he drove there voluntarily; he was signed in as a visitor; the interview lasted less than twenty minutes; and he was not restrained in any way. Thus, although some factors weigh in favor of a finding of custody, after considering the totality of the circumstances of the encounter, we conclude that a reasonable person in the defendant's position would not have believed himself to be in custody, and therefore, he was not in custody for Miranda purposes when he was questioned and signed the two consent forms. See In re E.G., 171 N.H. at ___ (slip op. at 13); McKenna, 166 N.H. at 677. The Federal Constitution offers the defendant no greater protection than does the State Constitution with regard to the defendant's rights under Miranda. See In re E.G., 171 N.H. at ___ (slip op. at 13); J.D.B. v. North Carolina, 564 U.S. 261, 270-71 (2011). Therefore, we reach the same result under the Federal Constitution.

Next, the defendant argues that his consent to the searches of the store and his person were not voluntary due to the coercive manner by which the detectives secured his consent in violation of his rights under Part I, Article 19 of the New Hampshire Constitution and the Fourth and Fourteenth Amendments to the United States Constitution. "A voluntary consent free of duress and coercion is a recognized exception to the need for both a warrant and probable cause." State v. Livingston, 153 N.H. 399, 405 (2006) (quotation omitted). The burden is on the State to prove, by a preponderance of the evidence, that the consent was free, knowing, and voluntary. Id. The voluntariness of the consent is a question of fact determined by examining the totality of the circumstances. Id. We will disturb the trial court's factual findings only if they are not supported by the record or are clearly erroneous. Id. Our review of the trial court's legal conclusions, however, is de novo. Id.

13

The trial court found that the State met its burden of establishing that the defendant validly consented to the searches. In reaching its conclusion, the trial court relied upon the following facts: (1) the State produced two consent forms signed by the defendant, see State v. Watson, 151 N.H. 537, 541 (2004) (use of written consent form may be an important factor when evaluating totality of the circumstances); (2) the defendant was not in custody, see id. at 540-41 (fact that defendant is in custody may weigh heavily against finding of valid consent); (3) the video recording demonstrated that Lombardi clearly explained that the defendant did not have to consent to either search, see id. at 541 (good policy for police officers to advise persons that they have right to refuse to consent to warrantless search); and (4) the defendant's tone in the video demonstrated that he freely and voluntarily gave his consent to search the store, cf. id. (upholding trial court's finding that even though the defendant's consent was "perhaps done unenthusiastically," the defendant freely, knowingly, and voluntarily consented to the search).

The defendant argues that custody is a factor that weighs heavily in determining whether consent was involuntary. See id. at 540-41. This is a valid point. However, we have already established that the defendant was not in custody when he consented to the two searches. Therefore, the detectives did not violate his Miranda rights by continuing to speak with him or by asking for his consent to search, and, thus, this factor does not weigh against a finding of valid consent.

The defendant next argues that "[r]egardless of whether the [d]efendant was in custody, his consent was involuntary for a myriad of other reasons." The defendant contends that the detectives went beyond informing the defendant of viable alternatives to consent — obtaining a search warrant — because the detectives threatened to close his business while they sought a warrant authorizing a search of the store. See Livingston, 153 N.H. at 406. In asserting this argument, the defendant seeks to distinguish the circumstances here from the facts in Livingston. In Livingston, we noted that informing a defendant of viable alternatives to a consent search does not necessarily vitiate consent. Id. The defendant in Livingston had initially refused to consent to a search of his vehicle. Id. at 406-07. When he refused, he thought he had no other options available. Id. at 407. The officer then informed the defendant that while he could continue to refuse a search of the vehicle, his refusal would result in a canine sniff search of the exterior of the vehicle and if the canine responded to the odor of narcotics, the officer would then seize the vehicle and apply for a search warrant. Id. In light of these circumstances, we affirmed the trial court's conclusion that the officer's statements were more explanatory than coercive and thus, the defendant's consent was voluntary. Id.

Contrary to the defendant's assertion, the present circumstances are similar to Livingston. Here, we rely upon the trial court's finding that "[b]ased on . . . Lombardi's tone and demeanor, Lombardi was [not] threatening to close

14

the defendant's store <u>permanently</u> or was otherwise making any other type of impermissible threat."  Therefore, as in <u>Livingston</u>, Lombardi's statement was more explanatory than coercive because Lombardi was merely attempting to advise the defendant of the consequences of his refusal to consent.  The circumstances are thus different here than in other cases where the alleged threats "went beyond 'a mere reference to the fact that [officers] could obtain a [search] warrant.'"  <u>State v. Socci</u>, 166 N.H. 464, 473-74 (2014) (quoting <u>United States v. Ivy</u>, 165 F.3d 397, 403 (6th Cir. 1998) (alleged threats included making arrests, using crowbars and sledgehammers, or taking away the defendant's children if he did not consent to a search)).

As the trial court also found, the defendant had already verbally consented to the search prior to this alleged "threat" being made.  Given that the defendant had already consented to the search of his business and considering the trial court's conclusion relating to Lombardi's tone and demeanor, we conclude that Lombardi's subsequent statement did not coerce the defendant to consent.  Thus, Lombardi's explanation of viable alternatives to consent does not weigh against a finding of a voluntary consent.

The defendant also argues that the trial court minimized his request to speak with a lawyer.  Specifically, the defendant contends that, regardless of whether he was in custody, the trial court failed to consider that he had requested to consult with an attorney in order to understand the consent form seeking his DNA sample and was never afforded an opportunity to speak with one.  We disagree.  The trial court considered this request for counsel and found that Lombardi did not ignore it.  The record supports this conclusion.  Lombardi informed the defendant that he could consult with an attorney when he stated, "[w]ell that's fine if you want to consult a lawyer about that.  Like I said I'm not going to force you to [consent]."  This statement informed the defendant that he could consult an attorney before consenting to the search of his person.

Moreover, the defendant's initial refusal to consent to the DNA search does not necessarily invalidate a subsequent consent as involuntary.  <u>See State v. Green</u>, 133 N.H. 249, 259 (1990).  The defendant could have continued to refuse to consent or could have left the room.  Notably, the defendant's initial refusal to consent to the body search, followed by execution of the consent form without asking any questions, suggests that the defendant understood his rights to refuse and was not coerced into signing the consent form.  <u>See State v. Patch</u>, 142 N.H. 453, 459 (1997) ("The fact that the defendant consented to a search of his vehicle's trunk and to portions of [another] residence, but refused to consent to a further search of his own residence, indicates that the defendant understood his right to refuse to consent to a search, and that the consent was knowingly, voluntarily, and freely given."); <u>State v. Prevost</u>, 141 N.H. 647, 650 (1997) (finding no coercion, based in part, on the fact that, despite the defendant's initial refusal and request for an attorney, she

15

subsequently signed the consent form without hesitation).  There is no evidence that the detectives coerced the defendant into signing the consent form and the defendant offered no evidence to the trial court that conflicted with Lombardi's testimony regarding the facts and circumstances surrounding the defendant's ultimate decision to consent to a search of his person.  Thus, his request to consult an attorney does not weigh against a finding of a voluntary consent.

Therefore, when considering the totality of the circumstances, we agree with the trial court that the defendant's consent to both searches was free, knowing, and voluntary.  Because the Federal Constitution affords no greater protection than the State Constitution, see Livingston, 153 N.H. at 408; Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973) (whether a consent to a search was voluntary is a question of fact determined from the totality of all of the circumstances), we reach the same result under the Federal Constitution as we do under the State Constitution.

Affirmed.

LYNN, C.J., and HICKS, BASSETT, and HANTZ MARCONI, JJ., concurred.

16