NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Strafford
No. 2019-0047

THE STATE OF NEW HAMPSHIRE

v.

BRIM BELL

Argued: February 17, 2022
Opinion Issued: August 16, 2022
Opinion Modified: November 18, 2022

Office of the Attorney General (Weston R. Sager, attorney, on the brief, and Elizabeth C. Woodcock, senior assistant attorney general, orally), for the State.

Anthony J. Naro, assistant appellate defender, of Concord, on the brief, and Thomas A. Barnard, senior assistant appellate defender, orally, for the defendant.

Brim Bell, the defendant, filed a supplemental brief with permission of the court.

HICKS, J.  The defendant, Brim Bell, appeals his convictions, following a jury trial in Superior Court (Howard, J.), on four class A felony counts of theft by deception.  See RSA 637:4, :11, I (2016).  We affirm.

The jury could have found the following facts.  The defendant ran a business at several New Hampshire locations restoring primarily Volkswagen vehicles.  Between January 1, 2011 and November 17, 2015, each of the victims, A.M., J.M., J.K., and J.T., hired the defendant to restore a vehicle.  During the time the defendant had their vehicles, he repeatedly asked each of the victims to send him more money, ostensibly for parts or other expenses related to the restoration of their vehicles.  Each victim made a series of payments to the defendant, totaling the following amounts: $81,900 from A.M.; $24,100 from J.M.; $11,521 from J.K.; and $55,055 from J.T.  None of the victims received a restored car back from the defendant.

The defendant testified to a series of events that negatively affected his business during 2010 and 2011 and increased his debt.  As a result, at the end of 2011, the defendant started gambling at casinos.  He testified that his "plan was to save the business."  The defendant admitted that he gambled with some of his customers' money and that none of them gave him permission to do so.  Instead, he "thought it made sense to keep it a classified situation" and "not something to advertise and boast to [his] clients about."  In 2016, the defendant left New Hampshire, owing the landlord of one of his facilities between $150,000 and $180,000.

In 2018, the defendant was indicted on six counts of class A felony theft by deception.  The indictments were substantially similar, alleging, in relevant part, that "pursuant to one scheme or course of conduct," the defendant:

> obtain[ed] or exercise[d] unauthorized control over U.S. currency, the property of [the identified victim] by deception, with a purpose to deprive [the victim] thereof, in that [the defendant] created or reinforced the false impression that he was repairing [the victim's] vehicle, which was false and which [the defendant] did not believe to be true, in order to continue to receive payments for repairs that were not being performed, the value of which exceeded $1,500.00.

The State moved to join the offenses for trial, arguing that they were: (1) "part of a common scheme or plan"; (2) "so logically and factually connected that they cannot reasonably be separated for the purposes of trial"; and (3) "connected in a manner that does not solely demonstrate that the accused has a propensity to engage in criminal conduct."  See N.H. R. Crim. P. 20.  The defendant objected.  The trial court granted the State's motion, concluding that "the charges are so clearly part of a common scheme or plan as to defy further explanation."

2

Following a jury trial, the defendant was convicted on four counts and acquitted on two.  He now appeals his convictions, arguing that the evidence was insufficient to convict him and that the trial court erred in granting the State's motion for joinder.  He raises additional issues in a pro se supplemental brief filed with this court's permission.  See State v. Belton, 150 N.H. 741, 750 (2004).

I.  Sufficiency of the Evidence

We first address the defendant's challenges to the sufficiency of the evidence.  "A challenge to the sufficiency of the evidence raises a claim of legal error; therefore, our standard of review is de novo."  State v. Vincelette, 172 N.H. 350, 354 (2019).  "To prevail upon a challenge to the sufficiency of the evidence, the defendant must prove that no rational trier of fact, viewing all of the evidence and all reasonable inferences from it in the light most favorable to the State, could have found guilt beyond a reasonable doubt."  Id.

The defendant argues that "the State failed to prove beyond a reasonable doubt that [he] created or reinforced the false impression that he was repairing the alleged victims' vehicles when he obtained money from them" because the evidence failed to "establish that [he] was not working on each person's vehicle."  More specifically, the defendant argues that because the indictments allege the deception element to be the creation or reinforcement of "the false impression that he was repairing [the victims'] vehicle[s]," the State was required to prove that he "had not done anything to 'repair' the cars when he represented that he had."  He contends that the evidence established, to the contrary, that he "was working on each person's vehicle when he requested money from them" even though he was "moving at a snail's pace."

Contrary to the defendant's contention, the State was not required to prove that he had done nothing to repair the victims' cars.  The State was required to prove that the defendant "obtain[ed] or exercise[d] control over property of another by deception and with a purpose to deprive him thereof."  RSA 637:4.  To prove the element of deception as charged, the State was required to prove that the defendant purposely "[c]reate[d] or reinforce[d] an impression which is false and which [the defendant] does not believe to be true, including false impressions as to . . . intention or other state of mind."  RSA 637:4, II(a).  As detailed below, the State proved that the defendant obtained money from each victim by creating or reinforcing the false impression that the money was going to be used to buy parts for, or otherwise applied to the repair of, the victim's vehicle, when, in fact, the defendant used the money for his own purposes, including gambling at a casino.

In addition, "to obtain a conviction for class A felony theft by deception, the State need only prove, in addition to the elements set forth in RSA 637:4, I, that the property taken was valued at more than [$1,500]."  State v. French,

146 N.H. 97, 100 (2001); see RSA 637:11, I(a). Thus, the jury need not have found that all of the money the defendant received from each victim was obtained in violation of RSA 637:4; rather, it need only have found that at least $1,500 from each victim was so obtained. See French, 146 N.H. at 98-99, 105 (noting, in appeal from conviction for theft by deception of workers' compensation benefits, that "the State was not required to prove theft of the entire $25,000 [lump sum settlement], and therefore the defendant's entitlement to a portion of the lump sum settlement is not inconsistent with a verdict of guilty of the offense charged").

With these principles in mind, we now examine the evidence with respect to each victim.

A. A.M.

The jury could have credited A.M.'s testimony that the defendant often asked her for more money, giving as reasons that "[p]arts [were] costing more," or "finding that more things that he needed would cost more than he had estimated." The jury heard extensive evidence of checks and wire transfers from A.M. posting to the defendant's bank account and withdrawals made at various casinos so close in time to those deposits that the jury could reasonably infer that the defendant intended to use that money for gambling and knew that the reasons he gave A.M. for needing that money were false. To give just one example, the jury could have found that on February 27, 2014, the defendant's bank account had a balance of "[n]egative $255.48." On February 28, the defendant made two balance inquiries on that account at automated teller machines at Mohegan Sun Casino. That same day, a wire transfer from A.M. in the amount of $2,500 posted to the defendant's account. Two withdrawals from that account were made that same day at Mohegan Sun in the amounts of $2,000 and $604.50. Accordingly, the evidence was sufficient to convict the defendant of class A felony theft by deception from A.M.

B. J.M.

The jury could have credited J.M.'s testimony that the defendant asked him for more money "[i]nitially, . . . because there was more rust in the car than he had anticipated," and later, "for various reasons: to buy parts or paint or that he needed the additional money to complete the car." As with regard to A.M., the jury heard evidence of checks and wire transfers from J.M. posting to the defendant's bank account, followed closely by withdrawals at various casinos. For example, the jury could have found that on February 19, 2013, the balance in the defendant's bank account was "[n]egative $450.54." On February 21, the defendant made four balance inquiries on that account at Mohegan Sun. That same day, J.M. wire transferred $2,000 into that account, and the defendant made a debit card purchase at Mohegan Sun in the amount

4

of $1,065.95, and then a second in the amount of $604.50. Accordingly, the evidence was sufficient to convict the defendant of class A felony theft by deception from J.M.

C. J.K.

The jury could have credited J.K.'s testimony that he sent his vehicle to the defendant's garage for restoration on November 17, 2015. The plan for restoration was to "sandblast [the car], get rid of and repair all the rust, the body work, the ruffles, paint it, and basically give [J.K.] back a show car." The original estimate for the job was $8,000 plus an additional $1,000 for sandblasting, for a total of $9,000, with a payment schedule of $1,000 per month. Nevertheless, J.K. testified, "[t]he first month, [the defendant] had already tried to hit me up twice for payments. Twice more the month after that." The defendant "would call [J.K.] up, requesting money for this, that, the other thing," getting "to the point where [the defendant] was harassing [him] for money." Between November 17, 2015 and May 3, 2016, J.K. made eleven payments totaling $11,520.59 to the defendant with the understanding that the money "was going to work on [his] car."

The defendant verbally "gave [J.K.] indication that there was work being done on [his] car" and "sent [J.K.] false photos of cars that he claimed was [J.K.'s] car that he had done work on." At some point, J.K. told the defendant he was coming to inspect his car. The defendant said he needed another week, which J.K. gave him. When J.K. "went up and inspected [his] car, . . . what [he] found was not a sandblasted prime[d] car, which [the defendant] had sent [him] a photo of." The car was "stripped down to the bare shell" and all the defendant had done was take off the pan, cut off the rear apron and "just rubbed some paint thinner on it, some paint stripping, to make it look like he had been doing some work," but which J.K. thought anyone could have done in 45 minutes. J.K. gave the defendant 30 days to "get his act together and get some work done," but when J.K. picked up his car in June 2016, after the defendant's landlord told J.K. he had to retrieve his car, "maybe a half hour['s] worth of [additional] work" had been done.

From this evidence, the jury could have found that J.K., under the impression that the money "was going to work on [his] car," paid the defendant more than $1,500 over: (1) the total contract price ($9,000); (2) the total payments due between November 2015 and May 2016 ($7,000); and (3) the established minimal value of the work the defendant performed on J.K.'s car. The jury also could have found that the defendant created the false impression that he was performing more work on J.K.'s car than he actually was, and that he needed more money to continue restoration work that was not actually being performed. In J.K.'s words, the defendant "sent me pictures of other people's cars and said it was mine to show that there was work being done on my car, which . . . clearly . . . there wasn't. To show me that hey, I'm doing

work, I need more money." From this and other evidence, the jury could have found that the defendant acted purposely in putting over $1,500 of J.K.'s money to his own personal use rather than toward repairing the car. Accordingly, the evidence was sufficient to convict the defendant of class A felony theft by deception from J.K.

D. J.T.

The jury could have credited J.T.'s testimony that he shipped his car to the defendant in January 2011 to modify it into a "hot rod." The project included work "to replace the motor, and do some body work, and new interior, new top," with an initial estimate of 8 to 12 months for completion and an initial budget of "around 25- to 30,000" dollars. Within three weeks of shipping the vehicle, J.T. paid the defendant $20,000 to get the project started, thinking that "most of it would be for the motor and the body work." Thereafter, the defendant asked J.T. for more money, "always for parts." Sometimes the defendant asked J.T. to send the money to another person, ostensibly for parts for J.T.'s car. One of the third parties to whom J.T. was asked to send money "for parts" was J.K., although J.K testified that he never sold car parts to the defendant. The evidence showed that between January 17, 2011, and August 2, 2016, J.T. made 24 payments totaling $55,055 to the defendant or to others at the defendant's direction.

The State introduced evidence of transactions posted to one of the defendant's bank accounts through admission of the bank records as a full exhibit and the testimony of the detective who subpoenaed the defendant's bank records, which highlighted certain transactions contained in those records. As detailed below, the jury could have found from that evidence that during a time frame in which the defendant was gambling at Mohegan Sun, he received a substantial sum of money from J.T. and used at least $1,500 of it at the casino for his own purposes.

According to the detective's testimony, the defendant's bank records showed transactions at Mohegan Sun on September 5 and 6, 2013, leaving him with an account balance of "[n]egative $184.33." On September 9, a $7,500 wire transfer from J.T. posted to the account. That same day, the defendant withdrew $600 from an automated teller machine in Dover and then spent $44.50 at Mohegan Sun. On September 10, there was a debit withdrawal from the account in the amount of $2,800. Although the detective did not testify as to the location of the withdrawal, his testimony indicates that the location would have been shown on the bank records themselves. As the appealing party, the defendant had the burden to provide this court with a record sufficient to decide his issues on appeal. Bean v. Red Oak Prop. Mgmt., 151 N.H. 248, 250 (2004); see State v. Sachdev, 171 N.H. 539, 549 (2018) (citing same). Because the defendant failed to provide us with the bank account

6

exhibits, we must assume that the bank records support the jury's verdict.  See Sachdev, 171 N.H. at 549.  Accordingly, from this and other evidence, the jury could have found that the defendant used at least $1,500 he obtained from J.T., under the false impression that it would be used to buy parts for J.T.'s car, in order to gamble.  Thus, the evidence was sufficient to convict the defendant of class A felony theft by deception from J.T.

The defendant nevertheless argues that "[t]o the extent that the trial court relied on a finding that the evidence supported a finding, beyond a reasonable doubt, that the money was not used for parts, but rather to gamble, the State's indictments did not contain any such allegation."  The State was not required, however, to allege how the defendant ultimately used the money he obtained from his victims, because an indictment "need not state the specific means by which the crime was carried out."  State v. Hermsdorf, 135 N.H. 360, 366 (1992).  Rather, "[a]n indictment is generally sufficient if it uses the language of the applicable statute."  Id.  "The question is not whether the indictment could be more certain and comprehensive, but whether it contains the elements of the offense and enough facts to warn the accused of the specific charges against him."  Id. (quotations and ellipsis omitted).  An allegation that the defendant used money he deceptively obtained from his victims "to gamble" was not required in order to meet that standard.

## II.  Joinder

The defendant next argues that the trial court erred in granting the State's motion for joinder.  "We will uphold the trial court's decision to join the charges unless we conclude that the decision constitutes an unsustainable exercise of discretion."  State v. Breed, 159 N.H. 61, 68 (2009).  "To show that the trial court's decision is unsustainable, the defendant must demonstrate that the ruling was clearly untenable or unreasonable to the prejudice of his case."  Id.

Rule 20 of the Rules of Criminal Procedure provides that "[i]f a defendant is charged with two or more related offenses, either party may move for joinder of such charges.  The trial judge shall join the charges for trial unless the trial judge determines that joinder is not in the best interests of justice."  N.H. R. Crim. P. 20(a)(2).  The rule further provides:

Two or more offenses are related if they:

   (A) Are alleged to have occurred during a single criminal episode; or

   (B) Constitute parts of a common scheme or plan; or

   (C) Are alleged to have occurred during separate criminal episodes,

7

but, nonetheless, are logically and factually connected in a manner that does not solely demonstrate that the accused has a propensity to engage in criminal conduct.

N.H. R. Crim. P. 20(a)(1).

Here, the trial court found that the charged offenses were "part of a common scheme or plan." We have not yet had occasion to consider what constitutes a "common scheme or plan" under the rule. Prior to adopting a court rule regarding joinder of criminal charges, we adopted, as a matter of common law, the ABA standards for joinder and severance of criminal offenses in State v. Ramos, 149 N.H. 118, 127 (2003). See State v. Brown, 159 N.H. 544, 550 (2009) (Brown II) (outlining history of our joinder jurisprudence). Those standards "categorize offenses as either 'related' or 'unrelated'" and "grant[] the prosecution and the defense an absolute right to sever unrelated charges." Ramos, 149 N.H. at 125. "'Related' offenses are those based upon the same conduct, upon a single criminal episode, or upon a common plan" and "'[u]nrelated' offenses are those that are not 'related.'" Id. (quotation omitted). Subsequently, in State v. McIntyre, 151 N.H. 465, 466-67 (2004), "we adopted the definition of common plan prescribed under New Hampshire Rule of Evidence 404(b)." Brown II, 159 N.H. at 550.

The defendant's argument in this case relies upon our construction of the term "common plan" in cases decided prior to the adoption of Rule 20(a). Accordingly, for purposes of addressing the defendant's argument, we assume without deciding that "common scheme or plan" under Rule 20(a)(1)(B) has the same meaning as "common plan" had under our common law joinder jurisprudence.

"The distinguishing characteristic of a common plan is the existence of a true plan in the defendant's mind, which includes the charged crimes as stages in the plan's execution." Breed, 159 N.H. at 69 (decided under common law). Accordingly, we have noted that it is insufficient "[t]hat a sequence of acts resembles a design when examined in retrospect." Id. Rather, "the prior conduct must be intertwined with what follows, such that the charged acts are mutually dependent." Id.

The defendant attempts to avail himself of the requirement that the charged acts be "mutually dependent." Id. He contends that the trial court erred in finding a "common scheme or plan" because it failed to find, and the State failed to offer evidence to support a finding of, "a mutual dependency between the charges." He argues that "[e]ach indictment alleged a discrete offense against an individual alleged victim, and the success of no offense hinged on the success of others."

8

"Historically, we have required a substantial degree of interconnectedness before offenses may be joined as mutually dependent." Petition of State of N.H. (State v. San Giovanni), 154 N.H. 671, 677 (2007). In some cases, we have found such interconnectedness when "the success of the later-occurring crimes depends upon the success of the earlier crimes." Id. at 675. Often, such cases involved the grooming of a sexual assault victim through "a clear progression in the level of abuse, allowing a reasonable person to make an objective finding of a common plan." McIntyre, 151 N.H. at 468; see also State v. Abram, 153 N.H. 619, 626 (2006) (noting that defendant's success in the final properly-joined offense "was dependent upon his having desensitized the [child victims] to engaging in sex by regularly subjecting them to severe acts of sexual abuse"). In such cases, we held that it was "reasonable to conclude that the acts . . . were mutually dependent, because the occurrence of the final assaults hinged upon the success of the earlier incidents." McIntyre, 151 N.H. at 467.

The defendant's argument presupposes that in order to find a common plan, the success of a defendant's later crimes must have depended upon the success of those preceding them. Admittedly, some of our cases could be read to support that view. See, e.g. State v. Brown, 156 N.H. 440, 442-44 (2007) (Brown I). We have not, however, relied upon that form of mutual dependency in all cases.

For instance, in State v. Schonarth, 152 N.H. 560 (2005), the defendant was convicted on seventeen counts of theft by deception. Schonarth, 152 N.H. at 561. The defendant falsely represented to the victim that he had filed a mortgage application in connection with his purchase of property from the victim. Id. "In the following years, the defendant asked [the victim] to lend him money to satisfy requirements allegedly imposed by [the bank] to obtain the loan." Id. He also asked the victim for other loans, each "in some way allegedly related to enabling the defendant to secure the mortgage for the purchase of [the victim's] property." Id. Eventually, the defendant told the victim that the bank would not finance his purchase of the property, but solicited additional funds from the victim for investment in a corporation that did not, in fact, exist. Id. at 561-62.

The trial court consolidated the seventeen indictments for trial, "finding that the acts constituted a common plan for purposes of joinder." Id. at 562. We affirmed that ruling on appeal, holding:

> Viewed objectively, the defendant's actions demonstrated a prior design that included the charged acts as part of its consummation. The charges all involved the same elderly victim; all were based upon the defendant's efforts to defraud the victim of

9

> his property through increasingly grandiose schemes connected to
> the defendant's alleged desire to repay his debt to the victim.

Id. (citation omitted). We said nothing about the success of the later frauds depending upon the success of the previous ones. See id.

Notwithstanding that Schonarth did not rely upon the "success of later crimes" theory, a fact we acknowledged in San Giovanni, 154 N.H. at 676, dicta in some of our subsequent cases attempts to fit Schonarth into that mold. For instance, in San Giovanni, we opined that even with no express reliance upon the theory, "there is no question that in [Schonarth], the success of the later frauds depended upon the success of the earlier frauds." San Giovanni, 154 N.H. at 676. Similarly, in Brown I, we opined that "[e]ach time Schonarth attempted to defraud his victim, his success was dependent on his previous schemes such that the acts were so intertwined as to be mutually dependent." Brown I, 156 N.H. at 443. We now reiterate that the "success of later crimes" theory played no cogent part in Schonarth's holding.

Nor did we rely on that theory in State v. Breed. In that case, the defendant, a medical examiner in Massachusetts, was convicted on nine counts of fraudulent handling of recordable writings, two counts of theft by deception, and one count of theft by unauthorized taking. Breed, 159 N.H. at 63. His convictions stemmed from medical examiner services he provided to certain facilities including Bayview Crematorium (Bayview). Id.

On appeal, the defendant challenged, among other things, the joinder of the theft by deception and fraudulent handling offenses. Id. at 68. The theft by deception counts "alleged that, for the purpose of receiving medical examiner fees, the defendant had signed cremation certificates indicating he had viewed the remains of [certain] decedents when he had not done so." Id. at 64. Seven of the fraudulent handling indictments "alleged that the defendant, with a purpose to deceive, had signed certain cremation certificates that falsely indicated that he was a New Hampshire medical examiner." Id. at 63. The other two fraudulent handling indictments "alleged that he, with a purpose to deceive, had signed other cremation certificates indicating that he had viewed certain remains and had made personal inquiry into the cause and manner of death, when, in fact, he had not done so." Id. at 63-64.

The defendant challenged the trial court's ruling that "joinder was proper . . . because the theft and fraudulent handling offenses were part of a common plan," and contended, to the contrary, that those "offenses were independent and not mutually dependent or part of a common plan." Id. at 69 (quotation omitted). We upheld the trial court's ruling:

In the instant case, we are persuaded that the trial court reasonably could have found that the theft by deception and fraudulent handling charges constituted mutually dependent acts that were part of a prior design. The record supports the trial court's finding that the defendant strove to develop an exclusive relationship with the operators of Bayview to increase the number of examination fees he could collect. To do this, he maximized his availability to the crematory, by, for example, signing cremation certificates when he had not conducted the requisite examinations. The more fraudulent transactions he participated in, the more reliant Bayview's operators became upon his services to carry out their own ends of processing as many bodies as possible. Based upon these findings, the trial court reasonably found that each fraudulent transaction or theft in which the defendant engaged was part of an overarching plan of furthering his increasingly profitable relationship with Bayview, and, in this way, the charges were mutually dependent. The trial court reasonably could have found that the defendant was not merely taking advantage of opportunities as they arose, but instead was exhibiting forethought and premeditation in his scheming.

Id. at 70 (quotation and brackets omitted). As in Schonarth, we said nothing about the success of later charged offenses depending on the success of the earlier ones. Rather, the individual offenses constituted part of an "overarching plan" and, presumably, contributed not to the success of each other, but to the success of that plan's ultimate goal "of furthering [the defendant's] increasingly profitable relationship with Bayview." Id.; cf. State v. Kirsch, 139 N.H. 647, 655 (1995) (noting that, under the common plan exception to Rule of Evidence 404(b), the "other bad acts must be constituent parts of some overall scheme[;] . . . there must be some overall scheme of which each of the crimes is but a part" (quotation and citation omitted)).

In accordance with our decisions in Schonarth and Breed, we reject the defendant's premise that joinder of offenses under the "common plan or scheme" provision of Rule 20 of the Rules of Criminal Procedure requires, in all cases, a finding that the success of later charged offenses depended upon the success of earlier ones. We reiterate that "[t]he distinguishing characteristic of a common plan is the existence of a true plan in the defendant's mind, which includes the charged crimes as stages in the plan's execution." Breed, 159 N.H. at 69 (decided under common law). This analysis ensures that "the defendant was not merely taking advantage of opportunities as they arose, but instead was exhibiting forethought and premeditation in his scheming." Id. at 70 (quotation and brackets omitted); cf. State v. Melcher, 140 N.H. 823, 828 (1996) (noting, in Rule of Evidence 404(b) case, that "[v]iewed objectively, the other bad acts must clearly tend to show that the defendant had a definite

11

prior design or system which included the doing of the act charged as a part of its consummation" (quotation omitted)).

With these principles in mind, we now examine whether joinder was proper in this case. The State alleged in its motion for joinder that "[e]ach of the cases has an almost identical fact pattern, occurred in the same time frame, and demonstrate[s] a common scheme or plan." The motion described various tactics the defendant allegedly used to solicit money from the victims and, in addition, recounted instances in which the defendant jointly involved some of the victims in his alleged scheme. Specifically, the motion alleged that the defendant twice directed J.M. to wire money to a "friend," who was actually another victim (J.T.), and that, at least once, the defendant told J.T. that he was buying parts for J.T.'s car from J.K. and directed J.T. to wire money to J.K. At the same time, the defendant told J.K. "that he was supposed to receive a money order from [J.T.], but for some reason it couldn't go through," so he asked J.K. "to take a 'wire' from [J.T.] and rewire it to the defendant." The State contended that "[t]he similar tactics used and the fact that [J.T.], [J.M.], and [J.K.] became unwittingly involved in each other's cases indicates that [the defendant] had a common purpose and plan when defrauding each of the named individuals."

The State further alleged that "[t]he commonality of the methods used to deprive the victims of their money and vehicles demonstrates that the defendant had the same plan and purpose when soliciting the victims for money." Significantly, the State alleged that "[t]he defendant used a series of on-going deceptive tactics to procure money from the victims. After a while, the defendant stopped asking for money to work on the vehicles and began to desperately plead for money to keep his shop open," which the victims gave to him "believing that their vehicles were still being worked on."

Based on the foregoing, the trial court reasonably could have ruled that each theft from each of the victims "was part of an overarching plan" serving the defendant's ultimate purpose of "keep[ing] his shop open" by paying his expenses, but not working on the victims' cars. In this way, the charges were mutually dependent. Breed, 159 N.H. at 70. Under these circumstances, we cannot say that the trial court unsustainably exercised its discretion by joining the charges in this case. See id.

Finally, in his pro se supplemental brief, the defendant presents two questions for our review. The first is "[w]hether the evidence used at trial was admissible?" The State argues that the defendant failed to preserve this issue for appellate review.

"As the appealing party, the defendant has the burden of providing this court with a record sufficient to demonstrate that he raised all of his appeal

issues before the trial court." State v. Adams, 169 N.H. 293, 299 (2016). The defendant asserts that he preserved this issue at his allocution during his sentencing hearing. We conclude that raising the issue at that time was insufficient to preserve it.

Our preservation requirement "reflects the general policy that trial forums should have an opportunity to rule on issues and to correct errors before they are presented to the appellate court." State v. Cavanaugh, 174 N.H. 1, 12-13 (2020). "Generally, a party should make an objection to evidence at the time it is offered, or at the earliest opportunity after the reason for objection becomes apparent." Broderick v. Watts, 136 N.H. 153, 168 (1992). Because the defendant failed to raise his challenge to the admissibility of evidence in a timely manner, it is not preserved and we will not address it. See id. at 169 (plaintiff's contention that defendant asked improper questions while cross-examining two of plaintiff's witnesses was not preserved when raised for the first time in a post-trial motion).

The second question is "[w]hether the Court erred by not allowing the Defendant to be present at all stages of trial?" Specifically, the defendant was not present when the trial court, prosecutor, and defense counsel discussed a question posed by the jury during its deliberations. Defense counsel opined at the time that the defendant need not be present. Accordingly, the defendant raises this issue as plain error.

"For us to find plain error: (1) there must be error; (2) the error must be plain; and (3) the error must affect substantial rights." State v. Pinault, 168 N.H. 28, 33 (2015) (quotation omitted). We need not address whether the first two prongs are met, because the defendant has failed to satisfy the third. See id. at 34 (assuming, without deciding, that the first two prongs were met and determining that the defendant failed to satisfy the third). "In order for a defendant to prevail under the third prong, the defendant must demonstrate that the error was prejudicial, i.e., that it affected the outcome of the proceeding." Id. (quotation omitted). Here, we agree with the State that the defendant "does not articulate how . . . his absence affected the verdicts or otherwise prejudiced him." Accordingly, we conclude that the defendant failed to meet his burden to show plain error. See id. (finding alleged deficiency in complaint was not shown to constitute plain error where defendant "made no showing, nor even argued, that the complaint limited her ability to prepare for trial or that she would have prepared for trial differently" absent the alleged deficiency (emphasis added)).

To the extent the defendant raises other issues in his pro se brief, we conclude that: he has failed to demonstrate that the issues are preserved, see Adams, 169 N.H. at 299; the issues are inadequately briefed, and therefore

13

waived, <u>see</u> <u>State v. Papillon</u>, 173 N.H. 13, 28, n.1 (2020); or they lack merit and warrant no further discussion, <u>see</u> <u>Vogel v. Vogel</u>, 137 N.H. 321, 322 (1993).

<u>Affirmed</u>.

BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.